SALVADOR R. QUIÑONES, ETC., Appellant, v. INDUSTRIAL COMMISSION OF PUERTO RICO ET AL., Respondents.

No. 240. Argued April 6, 1942.—Decided May 20, 1942.

Jorge Benítez Gautier for appellant. George A. Malcolm, Attorney General, M. Rodríguez Ramos, Assistant Attorney General, and

*Guillermo Atiles Moréu, Angel de Jesús Matos,* and *Joaquín Co-rrea, Legal Advisers of the State Insurance Fund,* for. the Manager of said Fund.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Salvador Quiñones, appellant herein, a civil engineer, alleges that in April 1937, he contracted for the installation in the streets of Mayagüez of sewer pipes and that, on taking an insurance policy with the State Fund, the manager classified the work as under code number 6306, at a premium rate of $11.15 for each $100 of payroll.

Thereupon he took an appeal to the Industrial Commission and alleged that classification 6319 was the one applicable in his case at a premium rate of $5.75 for each' $100 of payroll. The commission found for him and on appeal to this court the decision of the commission was upheld in a judgment dated March 11, 1938. 52 P.R.R. 799.

The execution of the work by the appellant in Mayagüez took until July 14, 1938, when the State Fund liquidated his policy on the basis of classification 6319, but not on that of the premium rate pertaining to the initial fiscal year 1936-37, for instead of doing so at the premium rate of $5.75 for each $100, it applied the premium rate as the same had been increased at the beginning of each successive fiscal year, to wit: from May 17, to June 30, 1937, $5.75 for each $100; from July 1, 1937 to June 30, 1938, $10.51 for each $100, and from July 1, to July 14, 1938, $9.75 per each $100.

Although the Manager of the State Fund deemed the appellant to be a temporary employer, he increased and collected the insurance premiums according to his unilateral interpretation of the statute under the practice followed up to February 14, 1940, when this court decided the case of *Miró* v. *Industrial Commission,* 56 P.R.R. 121, and thus ever since April 30, 1937, when the policy was issued, until its final liquidation, the manager made several semiannual liq-

uidations, the appellant always paying under protest the premium rates charged.

After the final liquidation which resulted in the manager collecting from the appellant $3,340.85 in excess, the latter applied for a modification by applying a single rate, namely, $5.75 for each $100 of payroll, but the manager refused because the statute, as interpreted by him, empowered him to vary annually the premium rates fixed in the original insurance contract, even where casual employers were involved, which view was in conflict with the decision of this court in *Miró* v. *Industrial Commission, supra.*

The appellant took an appeal to the Industrial Commission which affirmed the decision of the manager. He applied for a reconsideration but the same was denied. Thereupon he took the present appeal to this court.

■■ The facts, as alleged by the appellant, may be taken as true, except the one relative to the payment under protest which was not proved, and it should be noted that the steps regarding the refund of the sum paid in excess, in accordance with the rule established in *Miró* v. *Industrial Commission, supra,* were taken subsequent to February 14, 1940, the date on which that decision was rendered.

The question for decision, therefore, is whether in view of the construction given by this court on February 14, 1940, to the applicable law, in the sense that where temporary employers are concerned the rate to be charged is the one fixed upon the issuance of the policy even though the work might last several years, the State Insurance Fund is bound to refund the rates collected and paid without protest in 1937 and 1938 under the practice then followed which was to collect the rates fixed annually by the manager, even though the same should be greater or less than those of the year in which the policy was issued.

The commission held that there was no such obligation because, although a payment not due was involved, accord-

ing to the statute as construed by this court, the payment was effected through a mistake of law and not of fact, in which case the refund of the amount paid does not lie. It seems fair to transcribe the reasoning of the commission itself, as set forth by its member Mr. León Parra, which in its pertinent part reads as follows:

"In view of the decision rendered by our Supreme Court on February 14, 1940, in the case of the employer Manuel Miró, there is no question that Salvador Quiñones, the employer herein, erroneously paid to the Manager of the State Fund premiums which differed from that of $5.75 per hundred, during the two years subsequent to the fiscal year 1936–37, when he had to insure his workmen under a policy covering 'pipe extension' work. This, however. involves the commission by him of a mistake of law when he erroneously interpreted the scope of a statute, and the result of such an error, as held by us in the case of Soller Sugar Co., Petitioner, regarding 'undue collection of surcharges on arrears of premiums,' rendered by this Commission on July 14, 1937, which appears on page 333 *et seq.* of volume 5 of the Decisions of this Industrial Commission of Puerto Rico, is 'that according to the law and the jurisprudence the payment effected by the employer Quiñones was so effected by reason of his ignorance of the law then in force in which case he committed an error of law and the law does not protect him in obtaining the refund of the amount so paid."

"We transcribe therein the commentary of the textwriter Manresa y Navarro on §1895 of the Spanish Civil Code, equivalent to §1795 of our code, as follows:

" '1. Juridical Concept of the quasi contract of money unduly received . . . it is necessary, in the first place, that he who receives in payment the thing the subject matter thereof, should not be entitled to receive or collect the same, as otherwise such collection by him would not be improper. It is also an indispensable requisite of this quasi contract that the payment be made by mistake, for in the absence of such mistake the thing with which the same was effected would not be unduly delivered . . .

" 'But though the section does not determine the kind of mistake involved in such payment, it is of course understood that it must be a mistake of fact, for a mistake of law does not benefit anyone and can not, therefore, give rise to said quasi contract.

" 'This is inferred not only from the spirit of the law, but also from its language, for, as stated by Pedregal, if we properly consider art. 1901 (1801 C. C. of P. R.), it appears therefrom that "the refund of the amount received and the compensation for damages in a proper case, is required only where there has been a mistake of fact in the payment thereof; for, if delivery is made by alienation of a thing with the knowledge that it is not owed, there tacitly appears the intention of doing an act of liberality which is not at all binding on the receiver, because no obligation of a civil character may be imposed on anybody without his consent."

" 'The same opinion is held by Sánchez Román and Falcón, the latter asserting that *if the payment has been effected through a mistake of law, no quasi contract exists, nor is the receiver bound to make restitution, even though the payment was not due.*

" 'This was also the rule of law recognized by the legislation in force prior to the code, according to which an indispensable requisite of the aforesaid quasi contract was likewise the existence of an error of law on the part of the person who effected the payment, for if he improperly paid knowing that he did not owe, *or if he did so with knowledge of the fact but under a mistake of law, the debt not being civilly enforceable,* as, for example, if the thing was owed by virtue of a natural obligation, then there was no such quasi contract, and, consequently, no refund could be claimed, it being considered in such case that he meant to donate the thing delivered on that account.' (Italics ours.)

"And we further stated in said judgment:

" ' *        *        *        *        *        *        *

" 'This principle does not belong exclusively to our general civil law, of Roman origin and French contexture; and thus it happens that in the United States of America a similar principle is upheld, as we shall presently see. It is set forth in 30 Cyc. 1313, thus:

" 'D. Mistake.—Of Law. 9ª. General Rule.—Except where it is otherwise provided by statute, the general rule is that a voluntary payment made under a mistake or in ignorance of the law but with full knowledge of all the facts, and not induced by any fraud or improper conduct on the part of the payee, cannot be recovered back. And in so far as this rule is concerned, there is no difference between ignorance and mistake of law. It applies to a corporation as well as to a natural person, and in equity as well as in law.

" 'In the case of *Newburg Sav. Bank* v. *Town of Woodbury,* 173 N. Y. 55–1903, decided by the Court of Appeals of the State of New

York, this rule was clearly stated and the opinion therein contained numerous decisions in support of its holding.

" " " *            *            *            *            *            *            *

" 'The Court of Appeals . . . said:

" ' " We think that the general rule that money paid under a mistake of law cannot be recovered back, which was asserted and applied in these cases, is applicable to the case at bar. . . . . The plaintiff advanced the money to the town on its bonds for the very purpose of enabling the town to discharge what was supposed to be its obligation to the drafted men, and the latter received the money by virtue of the law as it then existed under a claim of right. All parties supposed at the time that the drafted men were entitled to the money and that it was their legal right to receive it. It now turns out that they were all mistaken, but it was a mistake of law and, therefore, the drafted men who received the money under the circumstances are not under liability to the plaintiff to restore what they have received." ' "

The same rule has been repeatedly upheld by this Supreme Court. See the cases of *Arandes* v. *Báez,* 20 P.R.R. 364; *Am. R. R. Co. of P. R.* v. *Wolkers,* 22 P.R.R. 264; *Sucn. of Marín* v. *Municipality of Arecibo,* 28 P.R.R. 477: and *Silva* v. *Heirs of Caratini,* 51 P.R.R. 754.

However, the appellant insists that the general doctrine of unearned increment (*pago de lo indebido*) is inapplicable herein, and that his payment, under the attendant circumstances, should be considered as involuntary; and that, therefore, he was clearly entitled to reimbursement as soon as the illegality of the payment became established by a judgment of this court which, although subsequently rendered, was the law from the beginning. *A. Cuesta & Co.* v. *Sancho Bonet. Treas.,* 54 P.R.R. 82.

In support of his contention the appellant transcribes part of §181 of the Title "Payment" in Ruling Case Law. The whole paragraph reads as follows:

"The general rule that a voluntary payment made in mutual mistake of law cannot be recovered back has been frequently relied on as a defense in actions brought against public officers to recover

alleged illegal fees exacted by them. But the courts generally favor the view that if an illegal demand is made by any person holding an official position, with the color of authority to enforce it, and such demand operates as a restraint on the exercise of an undoubted right or privilege, and in its enforcement there is no opportunity of contesting its validity, a payment of the demand in order to remove such restraint is compulsory, and not voluntary. Thus it is well settled that where money is exacted by and paid to a public officer in excess of his legal fees, in order to obtain the performance of an official duty, to which the party is entitled without such payment, an action lies to recover back the money, as having been involuntarily paid. So the exaction by a clerk or other official, against the protest of a party, of illegal fees as a condition for filing a document in his office which the party presenting it is entitled to have filed by him, renders the payment of such fees compulsory. Likewise a shipping commissioner who demands and receives unauthorized fees for reshipping members of the crew of a vessel for the next voyage may be compelled to repay the sums exacted, in an action brought therefor. But the payment of an illegal license fee is not to be considered compulsory where the license is not demandable as a right. The reason underlying the rule is that the officer and the public who have business to transact with him do not stand on an equal footing. It is his special business to be conversant with the law under which he acts, and to know precisely how much he is authorized to demand for his services; but with them it is different. They have neither the time nor the opportunity of acquiring the information necessary to enable them to know whether he is claiming too much or not, and as a general rule, relying on his honesty and integrity, they acquiesce in his demands. Hence it is that for the official wrong of taking illegal fees a statutory penalty is provided in favor of the party aggrieved. Indeed this class of payments stands on a different footing from that of any other class of involuntary payments, and a recovery will be more readily allowed, not only because of the inequality of position of the parties, but also on grounds of public policy to prevent extortion by officials. The distinction to be observed is between a payment made for the purpose of protecting or securing the present enjoyment of a right to which the person is immediately entitled and a payment made to prevent a threatened disturbance of such right where there is no authority to interfere with its enjoyment until the right of the threatening party shall be established in a judicial proceeding in which the rights of the

respective parties may be presented and determined. In the latter case a payment to avoid such threatened contest is regarded as voluntary, while in the former case it is compulsory.''

Without resorting to a detailed examination of the decisions on which the above-quoted text is based, it may be inferred from that very text that it deals with situations distinct from that of the present case.

In the case at bar the appellant was not only clearly entitled to appeal from the ruling of the manager to the commission and eventually to this court, but he knowingly exercised such right when the manager applied to his case classification 6306 instead of classification 6319 in connection with the same policy involved. Moreover, this is not a case of illegal fees; what the Manager of the State Fund did was to apply to the case of the appellant the uniform rule which he had been applying with apparent authority to all persons placed in a like situation as the appellant, and which was reversed when one of such persons attacked the same within the proper proceeding.

That being so, we think that there is no justifiable ground for holding that the commission erred in deciding the case in accordance with the general rule regarding payments not due and that, therefore, no review lies of its decisions of March 20, 1941, and February 6, 1942, which must be affirmed.